[No. 25306. Department One. December 12, 1934.]
RECONSTRUCTION FINANCE CORPORATION, *Appellant*, v. G. D. LYON, *Respondent*.[1]

*Graves, Kizer & Graves*, for appellant.

*Parker W. Kimball*, for respondent.

MILLARD, J.—This is an action upon two promissory notes for five thousand dollars each, made by defendant, payable to American Bank of Spokane, and pledged by the bank, before maturity, to plaintiff to secure payment of a loan made by the plaintiff to the bank. The defense of payment was pleaded, defendant alleging that, ten days prior to the maturity of the notes (the notes were in the possession of the bank for collection), he paid to the American Bank of Spokane the amount due on the two notes. Trial of

[1]Reported in 38 P. (2d) 1029.

the cause to a jury resulted in verdict in favor of the defendant. From judgment of dismissal rendered on the verdict, motion for judgment notwithstanding the verdict having been denied, the plaintiff appealed.

Appellant contends that what was done did not constitute payment. It is argued that, where one undertakes to collect a money demand as agent for another, in the absence of special instructions, the agent has no authority to accept anything other than money in payment, and that a collecting bank can not accept, in payment of notes belonging to its principal, a claim against itself for deposits made by the maker. That is, if respondent's certificate of deposit were, in fact, delivered by him to the collecting bank with the intention that same be applied, and the bank in fact accepted the certificate for that purpose, to the payment of the two notes, such transaction would not constitute payment.

All questions of fact are foreclosed by the jury's verdict in favor of respondent, whose version of the transaction—explicit direction to the collecting bank to use his certificate of deposit to pay the notes and agreement of the bank to do so—must be accepted as true. The jury believed—by its finding, we are bound—the evidence adduced in behalf of respondent to the effect that the minds of respondent and the collecting bank's official met; that the bank, in fact, applied respondent's certificate of deposit in payment of the two notes in question.

What was the legal effect of respondent's transactions with the collecting bank? That is: Did what was done constitute payment of the notes? That is the only question presented by the facts, which are summarized as follows:

Respondent and one Price had for several years been engaged in the contracting business in Spokane under

the firm name of Lyon & Price. It was an active and profitable partnership. Price attended to the performance of the firm's contracts. Respondent was in charge of the firm's business matters—banking details, borrowing of money, etc.

The partnership and the respondent, individually, had been customers of the American Bank for many years. The partnership borrowed money from time to time to carry out its contracts, repaying the loans as money came in from the contracts, then again borrowing as new contracts were obtained. As collateral to those loans, the respondent pledged certain securities. Those securities, irrespective of the fact whether the borrowings of the firm were large or small, had been allowed to remain in the bank without change. All of those securities were the individual property of respondent; none was owned by the partnership of Lyon & Price.

In 1926 or 1927, respondent, individually, borrowed eighteen thousand dollars from the American Bank. From time to time, he made payments thereon until he had reduced his individual indebtedness to ten thousand dollars.

The firm prospered. As it made money, that money was carried in the firm account in the American Bank. In December, 1931, the firm took three certificates of deposit, each in the amount of ten thousand dollars, in the firm name. In March, 1932, the partners divided these certificates. One was taken by respondent, certificate No. 7729, one, No. 7728, was given to Price, and the other, No. 7727, was held for the use of the firm. That is, while the firm had thirty thousand dollars, it was divided three ways: Ten thousand dollars to each of the partners and ten thousand dollars retained for use of the firm.

Instead of paying his ten thousand dollar indebt-

edness, to which amount the original debt of eighteen thousand dollars in 1926 had been reduced, respondent renewed his ten thousand dollar indebtedness on January 10, 1932, by executing two notes of five thousand dollars each, payable to the bank ninety days after date. The maturity date of the notes was, therefore, April 9, 1932. In February, 1932, the two notes described, together with others, were pledged by the American Bank to appellant to secure a loan of five hundred thousand dollars to it by appellant. All of these notes were entrusted to the Spokane branch of the Federal Reserve Bank as custodian. On March 28, 1932, the Federal Reserve Bank sent the two notes in controversy to the American Bank for collection and remittance. As stated above, the two notes were due and payable April 9, 1932. Respondent was never advised that his notes had been pledged by the bank to appellant.

On March 30, 1932, the firm of Lyon & Price borrowed six thousand dollars from the American Bank, on its firm note due thirty days after date. That transaction was handled by respondent. At the time that loan was made to the firm, the note was handed to a vice-president of the bank, to whom respondent handed his certificate of deposit in the amount of ten thousand dollars, which was payable thirty days after demand. The testimony is in conflict as to what was said. Respondent's version is that the vice-president, when the certificate of deposit was handed to him, inquired "What is this for?" Respondent informed the vice-president that it was to take care of his notes, which notes would fall due within ten days. Respondent further testified that Vice-President Leigh said:

" 'All right, I will give you a receipt for it,' so we walked over into the exchange window and a young man by the name of McDonnell there was in the cage,

and Mr. Leigh told him, he says, 'You give Mr. Lyon a collateral receipt for this,' and Mr. McDonnell, he asked me whether he was to make it in my name or in the name of Lyon & Price. I said, 'It is immaterial, make it whichever you wish.' Q. So a collateral receipt was issued at that time? A. Yes.''

The collateral receipt delivered to respondent reads as follows:

"Date March 30, 1932. No. 1547
''Name    Lyon & Price
                     ''MEMORANDUM
''Below is a memorandum of collateral deposited by you this day with The American Bank of Spokane.
''NOT TRANSFERABLE
                         ''The American Bank of Spokane
                                 ''R. M. McDonnell
              ''SCHEDULE OF COLLATERAL.
''Certificate of Deposit No. 7729 on ourselves for $10,000.00.''

An instrument made out by the bank, signed ''Lyon & Price, By G. D. Lyon,'' and retained by the bank, reads, in part, as follows:

''Name LYON & PRICE  Date MARCH 30, 1932  No. 1547
''Address
''To The American Bank of Spokane, Washington:
''In consideration of your making the loan to the undersigned, as hereinafter referred to, the undersigned hereby deposits with you collaterals as specified in the annexed schedule, as security for a note dated (no date given) in the principal sum of (no amount shown) Dollars,  . . .
                ''SCHEDULE OF COLLATERAL
''Certificate of Deposit No. 7729 on ourselves for $10,000.00.''

We have noted in parenthesis the absence from the foregoing instrument of the date of the note and the failure to state the amount of the note, payment of which it is contended the certificate of deposit was intended to secure. No demand for return of his two

notes, each in the amount of five thousand dollars, was made by respondent. On April 12th, three days after maturity of his two notes, respondent called at the American Bank and paid four thousand dollars upon the note of Lyon & Price for six thousand dollars. No one in the bank called respondent's attention to the fact that his two notes had not been paid, nor did respondent demand return of his certificate of deposit.

The bank closed its doors April 14th, two days after respondent called at the bank and paid four thousand dollars on the firm note of six thousand dollars, or fifteen days after the loan of six thousand dollars was made and fifteen days subsequent to the time respondent claims he surrendered his certificate of deposit to pay his personal notes for ten thousand dollars, the two notes in controversy.

No notice was ever sent to respondent by appellant until April 16th, two days after the bank closed, at which time appellant informed respondent that it had the notes; that is, respondent never knew until then that the notes were not at all times in the American Bank. Up to the time these two notes fell due, notice had always been sent to respondent of the maturity of the notes, of which the two in controversy were renewals, prior to the maturity dates, and respondent had always promptly renewed the notes.

Respondent testified that he first learned that the notes were not in the American Bank, immediately prior to notice of April 16th, from appellant, and shortly following the failure of the bank, at which time he called and "asked somebody down at the bank what they had done with those notes, and they told me that they had been turned over to the Reconstruction Finance Corporation."

The position of respondent that he directed the application of his certificate of deposit to the payment of

his notes, and that such direction was understood by the bank's president, is not improbable. There are other facts sustaining the respondent's version of the transaction, and the jury was warranted in finding, as it did, in favor of the respondent.

On May 6, 1927, respondent deposited bonds of the par value of eleven thousand dollars as collateral to secure payment of loans to Lyon & Price. Further collateral of ten shares of United States Rubber Company First Preferred Stock was deposited on April 13, 1928, as collateral to the firm's loans. That collateral was held by the bank at the time of the transaction and at the time of the trial of this cause. No request was ever made by the bank upon respondent, or upon the firm of Lyon & Price, to give additional security for loans to the firm. Loans to the firm were considered good without collateral.

It must also be borne in mind that, when the loan of six thousand dollars was made to Lyon & Price, the firm was not indebted to the bank. Under such circumstances, it would seem more probable that the firm would have deposited its certificate of deposit to secure payment of the loan of six thousand dollars if additional security were required, than that respondent would give his certificate as security for the firm loan.

So, too, it is consistent with respondent's theory that his certificate was applied to the payment of his notes; that, if the bank had not so applied the certificate of deposit, it would have notified him, as it had always done in the past, of the maturity of his notes. It would also be unlikely that the bank, three days after the maturity date when he called and paid four thousand dollars on the firm loan of six thousand dollars, would have failed to call his attention to the fact that the payment of his notes was past due. If the bank

did not understand respondent's instruction to pay his notes with the certificate of deposit, it would have notified him, as it had always done in the past, that the notes would fall due.

The facts justify a finding that the bank's vice-president understood the purpose of respondent's surrender of his certificate, and that the bank applied that certificate to the payment of respondent's notes, as respondent directed.

The collateral receipt signed by respondent and held by the bank and the receipt delivered by the bank to respondent must be read together. When so read and considered, we find nothing informing respondent that his ten-thousand-dollar certificate of deposit was not to be applied to the payment of his notes as he instructed the bank to do.

The jury found that respondent surrendered his certificate of deposit to the bank for the purpose of applying it to the payment of his notes, and that the bank accepted the certificate of deposit in payment of the notes.

The delivery of the certificate of deposit to the collecting American Bank, under the facts recited above, and the bank's acceptance of same in payment of the notes, constituted payment of the debt. It is the general rule that, where one undertakes to collect a money demand, as agent for another, in the absence of special instructions, the agent has no authority to accept anything but money in payment. A collecting bank may, however, receive its own certificate of deposit in payment of paper it holds for collection, and such acceptance constitutes payment.

"By custom banks receive their own certificates of deposit as payment, and such custom will be judicially noticed by the courts, and will justify a collecting bank in receiving its own certificate of deposit in payment

of paper it holds for collection; and the debtor is discharged, even though the bank fails before remitting.'' Morse on Banks and Banking (5th Ed.), § 305, p. 710.

The facts in *British & American Mortgage Co. v. Tibballs,* 63 Iowa 468, 19 N. W. 319, are very similar to the facts in the case at bar. In the case cited, the plaintiff sent a note and coupon, together with a release of mortgage, by mail, to a bank for collection. The letter accompanying same directed that the note, mortgage and release should be delivered ''in exchange for a New York draft, free of exchange,'' for the money represented by the note. The note and mortgage were presented to the debtor by the cashier of the collecting bank for payment. The debtor paid to the collecting bank a portion of the money due, in cash, and he delivered to the cashier of the collecting bank, as part payment, a demand certificate of deposit issued by the collecting bank, representing money that the debtor had actually deposited in said bank. The bank made no remittance of any of the proceeds, and shortly thereafter suspended payment. The creditor was not advised that the debtor had paid part of the debt by the surrender of the certificate of deposit until after the bank had failed, when it repudiated the transaction and brought an action to recover for the debt. The plaintiff contended that the debtor should have presented his certificate of deposit at the bank counter and had the money counted out to him, and then counted it back to the cashier to effectuate a payment. The court said:

''Counsel for the plaintiff base their right to recover mainly upon the well established rule, that an agent having a money demand for collection cannot discharge the obligation by receiving anything but money, unless specially authorized by his principal so to do; and it is contended that the certificates of deposit were not money, and that they are no more than obligations of

the bank to pay the amount of money which they represented to the holder on presentation.

"It appears in evidence that, on the day in which the transaction occurred, the bank was paying in cash all certificates of deposit presented to it. Roules, who paid the $400 to Massey, drew it from the bank on that day upon certificates of deposit, and the bank had on that day over $8,000 cash on hand with which to transact its current business, and at the time of and after the transaction, Massey saw displayed upon its cash table from four to eight hundred dollars. There can be no doubt that if Massey had presented his certificates he would have been paid. If he had done this, and immediately returned the money to the cashier, it is conceded this would have been payment. It was shown in evidence that it was customary for the Monroe County Bank, and, indeed, for all other banks, to receive their certificates of deposit in payment of claims in the hands of the bank for collection. But it is not shown by the evidence that the plaintiff had notice of such custom. We do not think it necessary either to prove the custom or to bring notice of it home to the plaintiff. Courts take judicial notice of the general customs and usages of merchants, and of whatever ought to be generally known within the limits of their jurisdiction, such as matters of public history affecting the whole people; (1 Greenleaf on Evidence, §§ 4, 5, 6;) and we think that the system by which nearly all the banks in this country transact monetary affairs, by the use of checks, drafts, and certificates of deposit, and without the actual handling of bank notes or coin, is so well known and understood, that no business man, much less a company whose sole occupation is loaning money, should be allowed to profit by pleading ignorance of it. The plaintiff, in effect, claimed that Massey should have presented his certificates of deposit at the bank counter, and had the money counted out to him, and then counted it back to the cashier. The law does not require any such vain and unnecessary formality in the transaction of business. According to the argument of the plaintiff, Massey should either have done

this, or have seen to it that the bank made the proper application of the certificate of deposit to the payment of the debt. This would have been unavailing. Suppose that in such case a person doing business with a bank should insist upon seeing that the proper application was made. He would be advised, and properly too, that he had his release from the mortgage and receipt for the debt, and that the bank would attend to its own business without his interference."

The bank in the case at bar was open until April 15th, performing its regular business; hence, of necessity, it must have paid checks, drafts or certificates of deposit as presented during all of that time. The fact that the bank received the certificate as payment—the jury so found, and by that finding we are bound—is proof that it would have paid cash if demanded. Morse on Banks and Banking (6th Ed.), § 305, p. 710.

In *Schafer v. Olson,* 24 N. D. 542, 139 N. W. 983, Ann. Cas. 1915C, 653, 43 L. R. A. (N. S.) 762 (the facts are recited in the quotation), the court said:

"This brings us to the only other point in the case, which is, whether the delivery of the Baird check to the bank on January 18th constituted payment. We think it did. There is no proof that on said date the bank was insolvent, but even if. there was, it is not contended that Baird had even the slightest intimation thereof, and at the time such check was tendered to and received by the bank it was, in so far as every one had reason to believe, except the bank officials, a perfectly solvent institution, and for eight days thereafter it. transacted its ordinary banking · business. True, such check was not actually charged to Baird's account on the books of the bank until after the bank examiner took possession, such officer making such charge on the books. But we do not deem this controlling, for it is fair to assume from the record that if Baird had at that time requested the cash on the check it would have been counted out to him, and he could then have

passed it back to the cashier in payment of the plaintiff's draft. This was a needless formality. Neither the law nor business usage exacted any such act on his part. It will be presumed, in the absence of proof to the contrary, that the bank, being at that time a going institution, receiving deposits and paying out moneys in the usual way, had funds on hand with which to pay the checks of its depositors in the usual manner. The fact that on January 26th the bank closed its doors and ceased doing business is not proof of its insolvency eight days prior thereto. We think that the act of the bank in honoring Baird's check, by receiving and retaining the same and by delivering the deed, operated in law as a payment of the draft. Such check, when thus accepted, was to all intents and purpose the equivalent of cash, and the mere matter of bookkeeping on the part of the bank officials in entering or neglecting to enter such transaction on the books of the bank, is not the test as to whether payment was made. On the latter point, we invite attention to the case of *Nineteenth Ward Bank v. First Nat. Bank,* 184 Mass. 49, 67 N. E. 670, where, among other things, the court in disposing of a similar question, said: 'It is true that the proper records were to be made upon the books; but the payment is effected by the acts, and not by the record, and was valid, even without records. Consequently the question of the subsequent records is not material. So far as respected the plaintiff, the defendant had received the money for the note, and was bound to remit it to the plaintiff'.''

See, also, *Pollak Bros. v. Niall-Herin Co.,* 137 Ga. 23, 72 S. E. 415, 35 L. R. A. (N. S.) 13; *Wells Oil Co. v. Marcus Oil & Supply Co.,* 206 Iowa 1010, 221 N. W. 547, 65 A. L. R. 1145; *Northwestern National Bank v. Reed,* 53 S. Dak. 222, 220 N. W. 509.

What motive or reason caused the collecting bank to make no record of the payment, and why it refrained from making remittance to appellant, we need not inquire. It is enough to say that the jury found, and the evidence amply sustains that finding, that payment was

actually made by respondent of his notes, and that "payment is effected by the acts and not by the record, and is valid even without records."

The judgment is affirmed.

BEALS, C. J., MAIN, TOLMAN, and GERAGHTY, JJ., concur.